UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

C.A. NO.: 4:14-CV-40088-DHH

**HOMETOWN BANK, A COOPERATIVE BANK, COUNTRY BANK FOR SAVINGS, EASTERN BANK, AVIDIA BANK, NORTH BROOKFIELD SAVINGS BANK, ROLLSTONE BANK & TRUST AND SOUTHBRIDGE SAVINGS BANK**
          PLAINTIFFS,
V.
**CITY OF WORCESTER AND CITY OF LYNN,**

          DEFENDANTS.

**DEFENDANT CITYOF LYNN'S OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## I.  Introduction

Defendant City of Lynn (hereinafter "City" or "Lynn") respectfully requests that this Court deny the Plaintiffs' Motion for a Preliminary Injunction. The Plaintiffs challenge the City's Homeowner's Bill of Rights ("Ordinance") passed to protect the health, safety and welfare of Lynn residents from the devastating and ongoing effects of the foreclosure crisis. With the exception of one Plaintiff, the complaining banks have not been, nor are they likely to be, subject to the requirements challenged in this lawsuit. The Plaintiffs are moving to enjoin two parts of the Ordinance: a provision requiring the maintenance and repair of foreclosing, foreclosed or vacant buildings in the City, and a requirement to mediate. Six of the seven Plaintiffs have not shown that they hold any mortgages in Lynn and would be harmed in any way. Plaintiffs cannot meet the threshold prong for a preliminary injunction, because they cannot show a "concrete and

particularized injury in fact" to establish standing, let alone "irreparable harm" if the Court denies the requested pre-trial relief.

In addition, Plaintiffs utterly fail to meet the standard for a preliminary injunction. On the merits, there are no preemption, unlawful tax, or Contract Clause problems because the Ordinance furthers rather than frustrates state law, it directly benefits lenders, and a history of regulation in the mortgage industry and language in mortgage contracts both demonstrate that such regulation was expected. Halting enforcement of the Ordinance would cause Lynn substantial hardship by exposing it to liability, lowering city-wide property values, and elevating crime and health risks. Finally, an injunction would thwart the public interest: unlike in the City of Springfield, Lynn's Mediation Program is actively serving Lynn residents, and therefore the Court should refuse to enjoin the City and preserve the status quo.

## II. Factual Background

### a. Foreclosure Crisis and the Effects on Lynn Health Safety and Welfare.

Since the foreclosure crisis began in 2007, at least 62,000 Massachusetts homes have been lost to foreclosure,[1] and an estimated 89,000 Massachusetts residents have been directly affected by foreclosure.[2] Although foreclosure's impact on the financial, emotional, and physical wellbeing of Massachusetts homeowners and their families cannot be understated, the distress it causes to neighboring homeowners, communities, and society is equally devastating. One demonstrable impact of foreclosure on local communities is financial harm. In addition to causing the values of foreclosed homes to decline,[3] foreclosure significantly reduces neighboring

---

[1] The Warren Group, Foreclosure Stats, Historical Statistics Table, *see* Exhibit 2.
[2] Julia Isaacs, *The Ongoing Impact of Foreclosures on Children*, Brookings Institute at 6 (2012).
[3] A Chicago study showed that foreclosure caused an average drop of $159,000 to property value. Dan Immergluck & Geoff Smith, *The External Costs of Foreclosure: The Impact of Single-Family Mortgage Foreclosures on Property Values*, 17 Hous. Pol'y Debate 57, 57 (2006).

property values. *See* Center for Responsible Lending, *Soaring Spillover: Accelerating Foreclosures to Cost Neighborhoods $502 Billion in 2009 Alone* at 2 (2009) (adjacent homes lose $7,200 of their value on average). Furthermore, foreclosures are not spread evenly across communities, but instead concentrated in certain cities like Lynn.[4] At the time the Ordinance was first passed in April 2013, the City of Lynn (hereinafter "the City" or "Lynn") had the fourth highest level of "foreclosure distress"[5] of all large cities and towns in the Commonwealth. *See* Affidavit of Tim H. Davis (hereinafter "Davis Aff.") ¶ 7. In fact, the Lynn foreclosure distress rate was 92 percent higher than the statewide rate. *Id.* Maps attached to Davis's Affidavit demonstrate the pervasiveness of foreclosure in Lynn as of July 1, 2014. *See* Davis Aff. at ¶ 6 & Exhibit A (maps).[7]

As a result, cities like Lynn that have been hit hardest by foreclosure suffer disproportionately from the effects of vacancy, including higher crime rates and smaller property tax bases to pay for police and security services.[8] According to the Director of Inspectional Services, Lynn presently has 796 foreclosed homes, and in "many instances, the bank is not responsive to the serious health, safety and sanitary concerns of the properties . . . in such

---

See also John Campbell, Stefano Giglio, & Parag Pathak, *Forced Sales and House Prices* (Nat'l Bureau of Econ. Research, Working Paper No. 14866, 2009).

[4] Barry Bluestone, et al., The Kitty and Michael Dukakis Center for Urban and Regional Policy, *The Greater Boston Housing Report Card: A New New Paradigm for Housing in Greater Boston* 7 (Mary Jo Meisner, Ed., Nov. 2012) (stating that Lynn, along with Brockton, Lowell, and Springfield, is among the cities where "the number of foreclosures remain[s] alarmingly high").

[5] "The *Foreclosure Monitor* categorizes a property in "foreclosure distress" if it is 1) a one - three unit residential property where a foreclosure petition has been filed; or 2) a foreclosure auction has been scheduled in the previous year; or 3) has been bank owned for up to two years." Davis Aff. at ¶ 5.

[7] Although the rate of foreclosure in Massachusetts has descended slightly from its 2010 peak, there has been a 72.5% rise in the rate of foreclosure petition filings over the past year. Davis Aff. at ¶ 10; The Warren Group, *Bay State Foreclosure Petitions Continue to Rise in July*, *available at* <http://www.thewarrengroup.com/2014/09/bay-state-foreclosure-petitions-continue-to-rise-in-july/>.

[8] *See* Isaacs, at 6 (citation omitted).

instances, the Inspectional Services Department is required to maintain and repair the property itself." *See* Affidavit of Michael J. Donovan (hereinafter "Donovan Aff.") at ¶¶ 5, 7, 8. The public cost also rises because the public bears the costs of securing, maintaining, and demolishing abandoned homes. *See* Kingsley et al., at 20; *see also*, Donovan Aff., at ¶ 12 (pays annual salary of one full-time person (approximately $60,000) to inspect, monitor, maintain and repair foreclosed properties).

Moreover, high concentrations of foreclosure and vacancy are associated with heightened crime levels. *See* Gould Ellen, Lacoe, & Sharygin, *Do Foreclosures Cause Crime?*, 75 J. of Urb. Econ. 59, 59–70 (2013) (correlation between foreclosure activity and crime); Dan Immergluck & Geoff Smith, *The Impact of Single-Family Mortgages on Neighborhood Crime*, 21 Hous. Studies 851 (2006), 854–55 (2006) (same). As noted by the City of Lynn Fire Chief, "vacant properties in the City of Lynn are often burglarized for copper and other scrap metals." *See* McDonald Aff. ¶ 9. Furthermore, vacant buildings become refuge for homeless people, but the buildings do not have heat, and to stay warm people use space heaters and fires, which pose significant fire hazard safety to occupants, neighbors, and firefighters. Id. at ¶¶ 3,4, 6.. The Chief of the Lynn Police Department has observed that "abandoned properties become attractive nuisances for crime" and are used as drug dens and headquarters for other illegal activities. Coppinger Aff. ¶¶ 4-5, 8-9. Abandoned properties "drain . . . the City of Lynn's law enforcement services." Id. at ¶ 11.

A growing body of research shows a strong link between home foreclosure and public health. Research has found a "spillover effect" from foreclosures, meaning negative health effects on neighbors who live in communities with high rates of foreclosure.[10] Related, non-

---

[10]For example, studies have shown an association between foreclosure rates and higher systolic blood pressure and heart disease. Mariana Arcaya, M. Maria Glymour, Prabal Chakrabarti, Nicholas A. Christakis, Ichiro Kawachi and S.V. Subramanian, *Effects of Proximate Foreclosed*

elective visits to emergency rooms and hospitals are higher in ZIP codes with the highest
foreclosure rates.[11] Finally, children affected by foreclosure have been shown to have greater
difficulties in school and in social relationships.[12]

ILocal foreclosure mediation programs, including in Philadelphia, Pittsburgh, Louisville,
and Santa Fe, have been set up around the country and achieved success in minimizing
foreclosures.[13] 35% of eligible homeowners who participated in the Philadelphia program
reached agreement with their lender, and 85% "remained in their homes 20 plus months post-
agreement."[14] The Department of Housing and Urban Development and the Justice Department
found that "mediation programs.. . . can be valuable and even essential tools as jurisdictions
around the country seek ways to combat the foreclosure crisis."[15]

### b.  Enactment of Ordinance and Creation of Mediation Program

In the context of the substantial harm to the residents and neighborhoods of the City of
Lynn by the persistent foreclosure crisis, the City Council proposed a Homeowner's Bill of

---

*Properties on Individuals' Systolic Blood Pressure in Massachusetts, 1987 to 2008* published in
Circulation, a Journal of the American Heart Association, originally published online May 12,
2014; available at <http://circ.ahajournals.org/content/129/22/2262>.

[11] Janet Currie & Erdal Tekin, *Is There a Link Between Foreclosure and Health?* at 3, (Nat'l
Bureau of Econ. Research, Working Paper  No.17310, Aug. 2011) (finding the foreclosure is
correlated with higher ER visits for major health problems including heart attack and stroke),
*available at* http://www.nber.org/papers/w17310.

[12] *See* Isaacs, *The Impact of Foreclosures on Families and Communities*, at 6.

[13] *See* Geoffry Walsh, National Consumer Law Center, *State and Local Foreclosure Mediation
Programs: Can They Save Homes?* 4–5 (2009), *available at*
http://www.nclc.org/images/pdf/200bforeclosure_mortgage/mediation/report‐state‐
mediation‐programs.pdf.

[14] Ira Goldstein, Colin Weidig, & Charles Boateng, *The City of Philadelphia's Mortgage
Foreclosure Diversion Program: Addressing the Rising Tide of Foreclosure*, 23 Hous. Pol'y
Debate 233, 233 (2013).

[15] U.S. Dep't of Hous. & Urb. Dev. & U.S. Dep't of Justice, *Emerging Strategies for Effective
Foreclosure Mediation Programs* 8 (2010), *available at* <http://www.justice.gov/atj/effective-
mediation-prog-strategies.pdf>.

Rights in 2013 (hereinafter "Homeowner Bill of Rights" or "2013 Ordinance"). The City Council aimed to "promote the health, safety and welfare of the public, to protect and preserve the quiet enjoyment of occupants, abutters, and neighborhoods, and to minimize hazards to public safety personnel inspecting or entering such properties." Barry Aff. (Ex. 1-A).  Two provisions are relevant here: first, it empowered the City to establish a mediation program in which foreclosing banks would participate in "in-person" mediation with a homeowner (a.k.a. mortgagor); second, it provided for "securing and maintaining vacant, foreclosing and foreclosed properties." The City Council unanimously passed the legislation – three separate times – in April 2013, May 2013, and March 2014.

The Ordinance originally went into effect after an Emergency Order was entered in May 2013 by the City Council declaring: "a Special Emergency exists involving the peace, health and safety of the people or their property in the City of Lynn." *See* Ex. 1. In accordance with the Ordinance, the City Solicitor interviewed mediation providers to hire a Mediation Program Manager to implement the Mediation Program. Sec. 4:00. See Barry Aff. ¶ 3. This process took the course of the summer 2013r. *Id.* In September 2013, the City Solicitor Michael Barry met with Brian Jerome and Sheri Wilson of MDRS, and agreed that MDRS would research and create Mediation Program. *See* Jerome Aff. ¶  4. MDRS invested considerable time and money researching and designing the Mediation Program. *See* Jerome Aff. ¶ 5 and MDRS Attachment A (discussing MDRS activities including researching more than 17 establish foreclosure mediation programs, conducting dozens of meetings with relevant experts, and identifying and training mediators). No funding was provided by the City to MDRS, which is only reimbursed by the fees paid by banks. *See* Jerome Aff. at ¶¶ 7, 10. (MDRS has expended approximately $102,000 since September 2013, and has received $42,250.00 in administrative fees from lenders.)

The Mediation Program officially launched on April 18, 2014 upon the execution of the contract between Lynn and MDRS. Since launch, MDRS has mailed notification letters to homeowners and lenders for 239 separate properties. *See* Wilson Aff. at ¶ 8. MDRS identifies relevant properties upon receipt from Lynn of the Notice of Right to Cure letters. *See* Ex. 1-B § 7. Twenty-seven (27) different banks/mortgagees submitted notices to the City and then were contacted by MDRS. *See* Wilson Aff. at ¶ 9. Of the Plaintiffs, only Eastern has submitted Notice to Cure Letters, but has not provided an Administrative Fee. *Id*. As a result, Eastern was issued two Notices of Lender Noncompliance. *See* Ex. 3 and 4 of Plaintiffs' Memo.

### c.  Plaintiffs' Foreclosure Activity in Lynn

Between January 1, 2009 and September 2, 2014, 1,095 total foreclosure deeds related to properties in Lynn were filed. Davis Aff. at ¶ 8. Six of seven Plaintiffs have not been named in any of the over 1,000 foreclosures deeds filed since January 2009. *Id.* The only named Plaintiff who has filed a foreclosure deed for a Lynn property in the last five years is Eastern. *Id.* Eastern has never recorded five or more foreclosure deeds in any one calendar year since 2009. *Id.* Also, as of July 1, 2014, six of seven of the Plaintiffs were not the mortgagees for any of the 166 properties in Lynn considered in foreclosure distress, and Eastern had only one such property. *Id.*

## III. Argument

### a.  Plaintiffs Do Not Have Standing to Assert Their Claims Against the City.

Plaintiffs bear the burden of showing that they have standing. *See Warth v. Seldin*, 422 U.S. 490, 498, (1975). As "the standing inquiry is both plaintiff-specific and claim-specific . . . a reviewing court must determine whether each particular plaintiff is entitled to have a federal court adjudicate each particular claim that he asserts." *Pagan v. Calderon*, 448 F.3d 16, 26 (1st Cir. 2006). To show it has standing under the U.S. Constitution, a plaintiff must show (i) an

"injury in fact" that is "concrete and particularized," and "actual or imminent," (ii) causation between the injury and complained-of conduct, and (iii) redressability that is "likely" rather than merely "speculative." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

As for the Mediation Program, six of the seven Plaintiffs cannot show an actual or imminent injury or threat of injury, because they have not begun filings for foreclosure. The Mediation requirement in the Ordinance is only triggered when a mortgagee sends a Notice of Right to Cure (a.k.a. 35A letter) that is then forwarded to the City and MDRS. See Ordinance § 7. The Program Administer of MDRS attests that six of the seven Plaintiffs have not submitted a Notice of Right to Cure to the City. *See* Wilson Aff. at ¶ 9.  Furthermore, these six Plaintiffs have not alleged that they even have mortgages in default in Lynn, and therefore have not shown any "threat of injury." Thus these six Plaintiffs' injury is no more than "conjectural or hypothetical," which is insufficient to show standing under *Lujan*, 504 U.S. at 560–61.

Plaintiffs attempt to cover their standing argument's weakness by implying they act on behalf of "similarly situated entities," but this is unavailing. *See* Pl.s' Memo at 3. Even if the Plaintiffs had filed suit on behalf of a single mortgage lender association, the association would need to show that at least some of its members suffered the alleged injury. *See, e.g.*, *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 40 (1976); *Merit Const. Alliance v. City of Quincy*, 13-2189, 2014 WL 3457605 (1st Cir. July 16, 2014). Here the Plaintiffs did not file as an association but as individually named plaintiffs, and the one Plaintiff that has filed two Notices of Right to Cure, Eastern, cannot show that it is likely to be redressed favorably. *Lujan*, 504 U.S. at 560–61. As discussed *infra*, Eastern cannot show redressability by establishing the likelihood of a favorable decision. *Simon*, 426 U.S. at 37–38.  Thus Eastern lacks standing to challenge the Ordinance's Mediation Program for itself, let alone for "similarly situated entities."

None of the Plaintiffs has suffered an injury in fact with respect to the Ordinance's maintenance provision. Plaintiffs have not alleged, and cannot, that they have had taken any action, suffered any penalties, or been forced to comply with the maintenance provision in any way. Furthermore, the Ordinance  specifically exempts from its cash bond requirement parties that are headquartered in the Commonwealth and have recorded five or fewer Foreclosure Deeds for Residential Properties in the prior calendar year at the Southern Essex Registry of Deeds. *See* Ordinance §13(A)(5). Each of the named parties falls within the §13(A)(5) exemption because none has filed more than five foreclosure deeds in a calendar year since 2009. *See* Davis Aff. at ¶ 8. Therefore none of the Plaintiffs has suffered an injury in fact because of the Ordinance's maintenance provision.

In sum, because none of the Plaintiffs has a concrete or particularized injury with respect to the bond requirement, six of seven of the plaintiffs cannot demonstrate an actual or imminent harm as a result of the Mediation Program, and the last plaintiff cannot show redressability, the Plaintiffs lack standing to challenge either part of the Ordinance.

**b.  Standard for Preliminary Injunction.**

To prevail on a Motion for Preliminary Injunction, the Plaintiffs must show that they have "(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003) (citations omitted)Plaintiffs fail to satisfy any of these factors.

**i.    Plaintiffs Cannot Show a Likelihood of Success on the Merits.**

The Plaintiffs' challenges to the Ordinance are likely to fail. First, state law does not preempt the Ordinance because localities may pass ordinances that exceed minimum state

standards, state foreclosure law and the Sanitary Code are not comprehensive, and the Ordinance

does not conflict with the state law purposes. Second, the bond requirement is not an unlawful

tax because the Plaintiffs are direct and primary beneficiaries of bond expenditures. Third, the

Ordinance does not violate the Contract Clause because there is no substantial impairment of the

Plaintiffs' contracts, and the Ordinance is reasonable and furthers a legitimate public purpose.

      **ii.**     **State Law Does Not Preempt the Lynn Ordinance**

The Home Rule Procedures Act empowers all Massachusetts municipalities to adopt

local ordinances that are "not inconsistent with the constitution or laws enacted by the general

court . . . ." Mass. Gen. Laws ch. 43B, § 13. That the state legislature has enacted legislation to

address a problem does not preclude cities from passing local ordinances to address the same

problem, *Bloom v. City of Worcester*, 363 Mass. 136, 157 (1973), or from imposing more

stringent requirements, *Tri-Nel Management, Inc. v. Board of Health of Barnstable*, 433 Mass.

217, 223–24 (2001). Preemption can arise in two ways: first, "when . . . the legislative intent to

preclude local action is clear . . . [through] plain expression of such intent," and second, when the

exercise of any local power or function frustrates "the legislative purpose of the statute [on the

same subject.]" *Bloom*, 363 Mass. at 155; *see also Grace v. Town of Brookline*, 379 Mass. 43, 54

(1979), such as where state legislation deals with a subject comprehensively, describing "what

municipalities can and cannot do," *Bloom*, 363 Mass. at 155. .  Express statutory requirements

that are general and involve subsequent elaboration do not create a comprehensive scheme. *See*

*Farfard v. Conservation Comm'n of Constable*, 32 Mass. 194, 204 (2000).

The Plaintiffs cannot show express intent to preclude local law relating to foreclosure.

The only two statutes that the Plaintiffs identify – state foreclosure law at M.G.L. c. 244, § 1 and

§ 14, and the State Sanitary Code at M.G.L. c. 111, § 127N – have no express language

precluding local laws. *See Plaintiffs' Memo* at 5, 8. In fact, the SanitaryCode expressly permits

more aggressive local regulation, *see* 105 Mass. Code Regs. 400.015, which "itself defeats an

assertion of preemption," *Tri-Nel Mgmt., Inc.*, 433 Mass at 244.

The Plaintiffs also cannot show that the Lynn Ordinance operates to frustrate state law.

Plaintiffs assert that a lack of an affirmative duty for mortgagees under state law presents a bar to

requirements at the local level. *See* Plaintiffs' Memo at 9 (citing *Negron v. Gordon*, 373 Mass.

199). Plaintiffs' claim fails: although M.G.L. c. 244, §§ 1, 14 is silent with respect to pre-

foreclosure mediation or the maintenance of foreclosed buildings, nothing in state foreclosure

law *prevents* a mortgagee from entering the property to make repairs prior to completing a

foreclosure, *see* M.G.L. c. 244, §§ 1, 14, and at least with respect to mediation, the Ordinance

itself provides that it will "not constitute an extension of the foreclosure process, nor an

extension of the right to cure period." Ordinance § 7. Because the legislature is silent on "what

municipalities can or cannot do" concerning mediation and property maintenance, *Bloom*, 363

Mass. at 155, and the foreclosure statutes are expressly capable of subsequent elaboration, *see*

*Farfard*, 32 Mass. at 204, the Ordinance does not frustrate state foreclosure law.

The Ordinance also does not frustrate the purposes of the Sanitary Code. As mentioned

above, the Code includes an express provision allowing local regulations "stricter than those

contained in the Code," 105 Mass. Code Regs. 400.015, which means that local laws like the

Ordinance requiring foreclosing lenders to address Code violations would further rather than

hinder the purposes of the Code, Lynn Ordinance at A(1), G. Since the Code is otherwise silent

on "what municipalities can or cannot do," *Bloom*, 363 Mass. at 155, this implies they have wide

discretion in choosing how to enforce and elaborate the Code, *see iFarfard*, 32 Mass. at 204.

No frustration arises from the Ordinance's application to the Plaintiffs merely because they are not mortgagees in possession.  The Code extends maintenance responsibilities to all parties with "legal title to any dwelling" – which in Massachusetts includes the lender and its successors and assigns – as well as to anyone who "*has care, charge or control of any dwelling*." 105 Mass. Code Regs. 410.020 (defining " Owner") (emphasis added). Since the plain text of the Sanitary Code does not explicitly exclude mortgagees not in possession from local regulation, there is no reason to suppose the Code could not be applied to them also.

          i.   <u>The Ordinance's Bond Requirement is Not an Unlawful Tax</u>

"[T]he burden is on the party challenging [a municipality's] fee to prove it is not lawful." *Denver Street LLC v. Town of Saugus*, 462 Mass. 651, 653.  In making an unlawful tax determination, courts consider whether "the charge (1) applies to the direct beneficiary of a particular service, (2) is allocated directly to defraying the costs of providing the service, and (3) is reasonably proportionate to the benefit received." *Silva v. City of Attleboro*, 454 Mass. 165, 172 (2009) (internal quotations and citations omitted).

The first two *Silva* factors are satisfied because the City's expenditures directly benefits the Lenders and defray the costs of maintaining the value of the property for which a bond is collected. The Plaintiffs allege, without affidavit or other corroborating evidence, that "[t]he bond obtained from one secured lender can be utilized to fund the expenses incurred in inspecting, securing, and marking other buildings in which <u>other</u> mortgagees have a secured interest." Pls' Memo. at 14. The Plaintiffs are incorrect. The Ordinance in fact provides that the bond will be used "to secure the continued maintenance of <u>the</u> Property . . .  and remunerate the City for expenses incurred in inspecting, securing, marking or making safe, <u>such Property</u> . . ." Ordinance § 13(A)(4). The Ordinance divides the Lender's bond payment into two parts: (1) a

fee used to fund oversight of the lender's property, and (2) the residual of the bond used for repairs of the subject property or returned to the lender upon sale and transfer. *Id.* §§ 13(A)(4); 13(A)(6). In other words, all expenditures are dedicated to maintaining the Lender's property value by setting up the administrative apparatus to determine whether the property complies with existing state and local laws, and making repairs should the Lender fail to do so.

The final *Silva* factor requires that the fee be "reasonably proportionate to the benefit received." 454 Mass. at 172 (quotations omitted). The amount of the administrative fee has yet to be determined, therefore Plaintiffs have no basis in fact to claim that fee will be disproportionate to the benefit they receive. *Silva*, 454 Mass at 172. Further, so long as the property is in compliance with state and local law, the residual of the bond will be returned to the Lender upon sale or transfer of the property. Ex. 1-B. Accordingly, the Plaintiffs fail to meet their burden.

ii.   The Ordinance Does Not Violate the Contract Clause

The Plaintiffs' argument that the maintenance requirements of the Ordinance impermissibly impair their mortgage contracts in violation of the U.S. Constitution's Contract Clause, Pls' Memo. at 10,[18] fails for two separate reasons: first, the Plaintiffs did or could have anticipated regulation of the type challenged, and second, the Ordinance is reasonable. When considering whether a law has "substantially impaired" a contract, courts look long at "the reasonable expectations of the parties," and "it is especially important whether the parties operated in regulated industry." *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 191–92 (1st Cir. 199); *see also Veix v. Sixth Ward Bldg & Loan Assn.*, 310 U.S. 32, 38 (1940). Here, the Plaintiffs are operating in an industry with a long history of regulation such that they,

---

[18] Plaintiffs do not challenge the constitutionality of the Ordinance's mediation requirements, only the maintenance requirements. Accordingly, only the constitutionality of the maintenance requirements is addressed herein.

as experienced lenders, should anticipate changes to the laws governing their conduct.

Massachusetts law regulating foreclosure procedures is older than the U.S. Constitution, *see*

st.1785 c. 22 § 2 (1785), codified at G.L. c. 244 § 1, and has been revised three times in the last

eight years. *See supra* at 7–8. Given this history, the Plaintiffs could have reasonably expected

there would be further regulation.

The language of the Plaintiffs' mortgage contracts buttresses this conclusion. The

standard Fannie Mae/Freddie Mac mortgage for the properties referenced in Exhibit 4 of the

Plaintiffs' Motion for Preliminary Injunction defines applicable law as "all controlling applicable

federal, state and local statutes, regulations, ordinances and administrative rules and orders . . . as

well as applicable final, non-appealable judicial opinions." Ex. 10, p. 2 (emphasis added). This

language recognizes that mortgage contracts are subject to evolving regulation, including

"ordinances" at the "local" level. *See id*. Furthermore, the mortgage for the home referenced in

Exhibit 4 of the Plaintiffs' Memorandum provides that if a "Borrower fails to perform," the

Lender may engage in acts to protect its interest, including acts to "enforce laws or regulations."

*Id*. at 6. Toward this end, the lender may take actions necessary for "securing and/or repairing

the property," including "entering the Property to make repairs … [or] eliminate building or

other code violations or dangerous conditions." *Id.* The Lender may also add any costs incurred

to the borrowers principal balance and charge interest at the contract rate. *Id. See* Ex. 9. The

mortgages for the only two properties identified in Plaintiffs' complaint empower the lender to

take these actions after the borrower defaults.[19]

Assuming *arguendo* that the Ordinance substantially impairs mortgage contracts, it

would withstand constitutional scrutiny because it is reasonable, i.e. it has a "legitimate public

---

[19] *See* Ex. 9, ¶ 9, and Ex. 10 p. 2.

purpose." *Houlton*, 175 F.3d at 191 (citations omitted). Courts defer to local governments concerning a law's reasonableness if it the law does not alter the government's existing contracts because "no appreciable danger exists that the governmental entity is using its regulatory power to profiteer or otherwise serve its own pecuniary interests." *Id.*; *see also Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 413 (1983) ("[C]ourts properly defer to legislative judgment as to necessity and reasonableness….") (citations and quotations omitted).

Here this Court should therefore defer to Lynn concerning the reasonableness of the Ordinance, which does not alter the city's contractual rights. The City is not a contracting party and there is no argument that it passed the Ordinance to serve its own financial interests. Protecting housing is a legitimate exercise of police powers. *Block v. Hirsh*, 256 U.S. 135, 156 (1921). ("Housing is a necessary of life. All the elements of a public interest justifying some degree of public control are present."). Courts recognize that local governments traditionally use their police powers to protect the welfare of their citizens. *See Houlton*, 175 F.3d at 191 ("Health and Safety are two mainstays of the police power.") (citations omitted); *see also* Ordinance, § 1 ("to promote the health, safety, and welfare of the public…").[20]

Finally, the Lynn Ordinance is reasonable because it does not conflict with the basic purposes of the mortgage contract. A mortgage is "a transfer of legal title to a property *for the purpose of securing a debt*." *Culhane v. Aurora Loan Servs. of Nebraska*, 826 F. Supp. 2d 352, 362 (D. Mass. 2011) (emphasis added). The Ordinance supports this purpose by providing for

---

[20] The Plaintiffs suggest in their brief that the Ordinance is invalid because it does not identify itself as an emergency measure and is not limited in duration. Pl.s' Mem. at 12. This argument fails because the Supreme Court has expressly held that a law "need not be addressed to an emergency or temporary situation" to be upheld against a Contract Clause challenge. *Energy Reserves Group*, 459 U.S. 400, 412 (1983). Moreover, the Ordinance was enacted in the context of an ongoing foreclosure crisis, and identifies as an emergency measure. *See Supra facts*; Ex. 1-A ("Borrower Bill of Rights Override Veto by Mayor - Order with Emergency…"). Thus, deference is appropriate here.

15

the maintenance of the property upon which a mortgagee intends to foreclose, thereby protecting the security interest. The Plaintiffs will recoup any cost of compliance through a foreclosure sale that accounts for the ongoing property maintenance. By establishing a program wherein the city monitors foreclosed properties and notifies mortgagees of violations of state and local laws, mortgagees are more likely to avoid legal costs associated with code enforcement proceedings. Further, because standard mortgage contract provisions allow lenders to add maintenance costs to the borrowers' debt, a lender will never be in the position of incurring costs related to the property that it cannot seek from the borrower. *See* Ex. 9, Ex. 10. In light of these facts, the maintenance requirements of the Ordinance do not substantially impair mortgage contracts.

**ii.     No Irreparable Harm to the Plaintiffs if Injunction is Not Issued.**

The First Circuit has repeatedly held that showing "irreparable harm" is an "essential prerequisite" for attaining a preliminary injunction. *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004)) *citing Ross-Simons of Warwick, Inc. v. Baccarat, Inc.* 217 F. 3d 8, 13 (1st Cir 2000). The risk of irreparable harm must be real and immediate, rather than an "unsubstantiated fear [] of what the future may have in store." *Biogen Idec MA Inc. v. Trustees of Columbia Univ. in City of New York*, 332 F. Supp. 2d 286, 296 (D. Mass. 2004) (quotations omitted). "The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm *rests squarely upon the movant*." *Charlesbank*, 370 F.3d at 162 (emphasis added). Despite this requirement, the Plaintiffs do not allege in their Memorandum that they will suffer irreparable harm if the injunction is denied, which alone is fatal. *Id.*

Even if Plaintiffs had made a "necessary threshold showing," they could not demonstrate that they would suffer irreparable harm. *Id.* As discussed *supra*, none of the Plaintiffs here can show it is even subject to the bond requirement at present or that the City has taken any action

for the maintenance requirement. As for the mediation program, only one Plaintiff, Eastern

Bank, is currently required to mediate, and the only conceivable harm that could result from the

injunction's denial is that it will have to participate in two mediations or continue to accrue

penalties for its non-compliance. Putting aside the obvious unclean hands Eastern brings to this

litigation, courts have repeatedly held that "economic harm alone . . . will not suffice as

irreparable harm unless the 'loss threatens the very existence of the movant's business.'" *See Tri-*

*Nel Mgmt., Inc. v. Bd. of Health of Barnstable*, 433 Mass. 217, 227–28(2001) (quotations

omitted). The cost of participating in the mediations threaten the movant's multi-billion dollar

business. Finally, any pecuniary damages suffered could be remedied upon resolution of the

case, and therefore "irreparable harm" does not exist. *Charlesbank* 370 F.3d at 162.

### iii.     Balance of the Harm to the City Far Outweigh Any Hardship to the Plaintiffs.

The Court should deny the requested preliminary injunction because a balancing of the

hardships favors the Defendants. *See Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir.

2003). If MDRS, as the Mediation Program Manager and creator of the Mediation Program for

the City of Lynn, were forced to stay its operations, it could deal a fatal blow to the program. The

City of Lynn searched many months to secure a Mediation Program Manager willing to provide

the considerable "up front" costs to design and develop the program. MDRS has expended over

$100,000 in work hours and expenses, and has only received approximately $40,000 in fees to

date. See Jerome Aff. at ¶¶ 10, 11. If the Mediation Program is enjoined, "the amount of work it

would take for MDRS to thereafter start over and re-launch would make it unlikely that MDRS,

a small business, could continue administration of [Program]." *See Id.* at ¶ 13. Given this

potential result, the harm to the City of Lynn could be substantial. In addition to any potential

claim MDRS might have against the City, the entire Program could be set back years even if the

injunction were short lived. During such time, the City would bear all the negative effects from potentially avoidable foreclosures. *See e.g.*, Ex. 3, Donovan Aff., at ¶ 12 (Inspectional Services pays annual salary of one full-time person, approximately $60,000, to inspect, monitor, maintain and repair foreclosed properties).

In addition to the harm to the City and the public interest it represents, individual homeowners who could lose their homes during the injunction. The loss of real property, particularly a home, is widely recognized as irreparable harm. *See Pub. Serv. Co. of New Hampshire v. Town of W. Newbury*, 835 F.2d 380, 381 (1st Cir. 1987) ("Showing the irreplaceability and uniqueness of real property . . . is also a showing of the irreparable nature of the harm."); *Johnson v. U.S. Department of Agriculture*, 734 F.2d 774, 789 (11th Cir 1984) ("real property and especially a home is unique."); *Lopez v. Wells Fargo Bank, NA*, No. 3:11-CV-740-RCJ-WGC, 2011 WL 6936345 (D. Nev. Dec. 30, 2011) (Slip Copy) ("Plaintiffs will suffer irreparable injury if Defendants are able to sell Plaintiffs' home without the authority to do so."); . In sum, the balance of the hardships clearly weighs against an issuance of an injunction.

**iv.     The Public Interest Will be Injured if an Injunction is Granted.**

The Plaintiffs' request for a preliminary injunction cannot be granted unless there is a "fit (or lack of friction) between the injunction and the public interest." *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003). The Plaintiffs cannot demonstrate a lack of friction here because an injunction would plainly conflict with the public interest. *See Yakus v. U. S.*, 321 U.S. 414, 440 (1944). Although Plaintiffs are at no risk of sustaining immediate and irreparable harm, any affected interests they have facially conflict with the City's financial, safety, public health interests in enforcing the Ordinance. Furthermore, since enforcement has already begun,

preserving the status quo here requires that enforcement continue. *See Petricca Const. Co. v. Com.*, 37 Mass. App. Ct. 392, 399 (1994).

      Plaintiffs also cannot demonstrate that enjoining the enforcement of the Lynn Ordinance is in the public interest. The burden rests with Plaintiffs to show that a preliminary injunction would further the public interest. *Stonestreet v. Kreppel*, 2010 W.L. 972203 *4 (D. Mass. 2010). Where an injunction would "adversely affect a public interest," relief is withheld "until a final determination of the rights of the parties, [even] though the postponement may be burdensome to the plaintiff." *Yakus*, 321 U.S. at 440. Even if Plaintiffs could successfully argue that their business interests are adversely affected, nowhere have Plaintiffs asserted that their business or financial interests align with the public interest, nor have they alleged facts showing that the continued enforcement of the Ordinance conflicts with the public interest in any way. On the contrary, for the reasons described above, the public interest in preventing foreclosure and its harmful effects demands continued enforcement of the Ordinance. *See Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 241-42 (D. Mass. 2011).

      Plaintiffs imply but do not explicitly argue that enjoining enforcement of the Ordinance\ is in the public interest because the U.S. First Circuit Court of Appeals stayed enforcement of a similar mediation program in Springfield, Massachusetts. *See Easthampton Sav. Bank v. City of Springfield*, Order of Court, No. 12-1917 (1st Cir., Dec. 17, 2013).  However, in *Springfield* the city had voluntarily stayed enforcement of its ordinances, and the First Circuit expressly indicated that its intent in granting the stay was to maintain the status quo. *Id.* at 1. Here, unlike in *Springfield*, the City of Lynn has been actively engaged in enforcing its Ordinance. *See* Ex. 7, Jerome Aff. (summarizing efforts and expenses of mediation program administrator); Ex. 8, Hodes Aff. (multiple homeowners have already received sustainable outcomes through the

program). Therefore, the status quo here would be the continued enforcement of the Ordinance, not its halt. Since "the purpose of a preliminary injunction is 'only to preserve the status quo while the case is under consideration[,]'" *Petricca Const. Co. v. Com.*, 37 Mass. App. Ct. 392, 399 (1994) (quotations omitted). Thus Plaintiffs' request for an injunction should be denied.

Finally, Plaintiffs' attempt to enjoin enforcement of the Ordinance should fail because enforcement of the Ordinance embodies the will of the people of Lynn. *See Biotti v. Board of Selectmen of Manchester*, 25 Mass. App. Ct. 637, 643 (1988). Here as in *Biotti*, the Ordinance reflects the will of the City to minimize foreclosure's harmful effects, which affect individual homeowners and the general public. Because Lynn has a strong interest in enforcing the Ordinance in accordance with the will of its residents, enforcement should not be halted until the Ordinance's merits have been determined.

## v.    CONCLUSION

For the foregoing reasons, the City of Lynn requests that Plaintiffs' Motion for a Preliminary Injunction be denied.


Respectfully submitted,

                                        CITY OF LYNN
                                        By its attorney,


                                        /s/ *Eloise P. Lawrence*
                                        Eloise P. Lawrence, BBO # 655764
                                        Lee Goldstein, BBO # 200180
                                        Charles Carriere, BBO # 601081
                                        Harvard Legal Aid Bureau
                                        23 Everett Street
                                        Cambridge, MA 02138
                                        (617) 496-5484
                                        elawrence@law.harvard.edu

<u>CERTIFICATE OF SERVICE</u>

I, Eloise P. Lawrence, hereby certify that, on this 11th day of September, 2014, the within Notice of Appearance was served upon all counsel of record through this Court's electronic filing system as identified in the Notice of Electronic Filing.

<u>/s/ *Eloise P. Lawrence*____</u>